# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| ALAN STEINKAMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:16-CV-1550-M |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration, | ) ) ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Claimant, Alan Steinkamp, commenced this action on September 19, 2016, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying his claim for child disability and supplemental security income benefits.[1]

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v.*

---

[1] Claimant, who was born on May 28, 1990, was 24 years old at the time of the ALJ's decision, and 22 years old when he applied for Supplemental Security Income benefits on December 19, 2012. But he was only 17 years old on his alleged onset date of disability, October 2, 2007. *See* Tr. 249.

*Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically claimant asserts that the ALJ: (1) should have found him to be disabled under Listings 12.04 and 12.05C; (2) improperly rejected the examining psychologist's opinion; (3) failed to assess the intensity and persistence of claimant's symptoms pursuant to Social Security Ruling 16-3p; (4) and failed to state adequate reasons for finding claimant's testimony to be not credible. Upon review of the record, the court concludes that claimant's argument about Listing 12.05C has merit.

Listing 12.05C, addressing intellectual disability, states as follows:

> *Intellectual disability.* Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.05C (listings) (italics in original, ellipses

2

supplied).[2]

There is no question that claimant experienced impairments, other than intellectual disability, that caused significant work-related limitations of function. Indeed, the ALJ found that claimant's attention deficit disorder, history of substance abuse, and bipolar disorder were severe impairments.[3] Thus, the focus of the ALJ's analysis, and of the parties' arguments, has been on claimant's IQ scores and adaptive functioning.

The ALJ found that claimant did not satisfy Listing 12.05C because he did not have a *valid* IQ score between 60 and 70.[4] Larry F. Wood, Ph.D., a consultative psychologist, examined claimant on April 3, 2006, when claimant was 15 years old, in connection with a prior claim. Intelligence testing resulted in a verbal comprehension IQ score of 87, a *perceptual reasoning IQ score of 65*, *a working

---

[2] Effective September 3, 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1). This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people." *Id*. at 46,499. But this change "d[id] not affect the actual medical definition of the disorder or available programs or services." *Id.* at 49,500.

*Frame v. Commissioner, Social Security Administration*, 596 F. App'x 908, 910 n.2 (11th Cir. 2015) (alteration in original).

[3] Tr. 16.
[4] Tr. 18.

3

*memory IQ score of 68*, a processing speed IQ score of 70, *and a full scale IQ score of 68.* Dr. Wood believed that those test results were valid.[5] He stated that claimant's

> performance on intellectual testing was generally consistent with previous test results. His current level of intellectual functioning is at the high end of the Mild Mental Retardation[ range], but he displayed a significant range of abilities across subtests. He has relatively good verbal skills with much lower visual-motor, perceptual, and processing skills. He certainly would benefit from continuing enrollment in specialized educational resources. He should be able to learn simple and repetitive job tasks, but will need specific vocational training to maximize his abilities.

Tr. 423 (alteration supplied). When addressing whether claimant had exhibited a lifelong history of mental retardation, Dr. Wood stated that claimant

> has been seen as functioning in the Borderline range of intellectual ability most of his life. Currently, his tested intellectual ability is at the high end of the Mild Mental Retardation range. He should be able to learn simple job tasks, but will need specialized academic and job training resources.

Tr. 425.

Upon examination by Dana K. Davis, Ph.D., another consultative psychological examiner, on August 19, 2008, claimant received *a verbal IQ score of 69*, a performance IQ score of 78, and a full scale IQ score of 71.[6] Dr. Davis stated:

> The client's effort on this exam was good, and these results are felt to be a good estimate of his current intellectual functioning. They are also extremely consistent with the testing using the WISC instrument

---

[5] Tr. 424-25.
[6] Tr. 443.

4

approximately four years ago, where his full-scale IQ fell within the borderline range. I will note that the client does have relatively poor mathematic skills, with that being his lowest subtest, and he has relatively low comprehension skills as well as a paucity of fund of information.

Tr. 443.

David R. Wilson, Ph.D., a consultative examiner, administered intelligence testing on October 6, 2014. Claimant achieved a verbal comprehension score of 80, *a perceptual reasoning score of 69*, a working memory score of 71, a processing speed of 74, and *a full scale IQ score of 69*. Dr. Wilson acknowledged that claimant's full scale IQ score placed him within the "Intellectually Disabled Range," but he believed that claimant's lack of attention was a factor in his "very poor performance."[7] Specifically, Dr. Wilson believed claimant "was trying, but he also was impulsive and tended to answer without a lot of thought, and he also would tend to guess or say 'I can't' as items became difficult. He clearly has a problem maintaining focus and effort."[8]

The ALJ found that any of claimant's IQ scores below 70 were not valid because they were "inconsistent with school records."[9] The ALJ did not explain which "school records" she was referring to, but she presumably was considering two

---

[7] Tr. 491.
[8] Tr. 490.
[9] Tr. 18.

5

intelligence tests ordered and administered by the school systems while claimant was still a student. The first such test, which was administered in February of 1999, while claimant was in primary school, resulted in a verbal IQ score of 81, a performance IQ score of 82, and a full scale IQ score of 80.[10] The second test, which was administered in January of 2005, while claimant was in 7th grade, resulted in a verbal IQ score of 75, a performance IQ score of 81, and a full scale IQ score of 76.[11]

The mere existence of inconsistent scores from claimant's school days does not necessarily mean his later scores are invalid. Without any explanation from the ALJ of the reasons for and importance of that inconsistency, the court cannot say that the ALJ's decision was adequately explained and supported by substantial evidence. Further development of the record is required to determine the validity of claimant's IQ scores.

Further development of the record also is necessary with regard to claimant's adaptive functioning. The ALJ's only finding on adaptive functioning was a statement that "[a]daptive skills are noted to be normal."[12] To support that statement, the ALJ cited the results of two "CAB (Clinical Assessment of Behavior) Parent Extended Form Reports" completed by claimant's grandparents on November 12 and November

---

[10] Tr. 379.
[11] Tr. 399.
[12] Tr. 18 (alteration supplied).

16, 2007, when claimant was 17 years old and in the 8th grade. According to the grandmother's assessment, claimant demonstrated mild adaptive weaknesses in social skills and competence, and he fell within the normal range of "adaptive behaviors."[13] According to the grandfather's assessment, claimant demonstrated mild adaptive weaknesses in social skills, competence, and "adaptive behaviors."[14] Those records simply do not support the ALJ's finding about claimant's adaptive functioning. Moreover, the record as a whole contains sufficient evidence of adaptive functioning to warrant further consideration.

The decision of the Commissioner is REVERSED, and this action is REMANDED to the Commissioner of the Social Security Administration for further consideration of claimant's IQ scores and adaptive functioning, and for any other necessary proceedings consistent with this order.[15]

The Clerk of Court is directed to close this file.

DONE this 15th day of June, 2017.

_____
United States District Judge

---

[13] Tr. 430.

[14] Tr. 433.

[15] Because remand is warranted on these grounds, the court need not consider claimant's other arguments in support of remand.